R. L. SING, ON BEHALF OF HIMSELF AND OTHER TAXPAYERS OF THE CITY OF CHARLOTTE WHO MAY DESIRE TO JOIN WITH HIM, v. CITY OF CHARLOTTE, THE CITY COUNCIL OF THE CITY OF CHARLOTTE, AND CLAUDE L. ALBEA, HERBERT H. BAXTER, JOHN F. DURHAM, T. V. GRISWOLD, W. N. HOVIS, W. ROY HUDSON, H. H. HUNTLEY, A. PARKS LITTLE, J. S. NANCE, L. R. SIDES, AND JOHN L. WILKINSON, AS MEMBERS OF SAID COUNCIL, AND BEN E. DOUGLAS, MAYOR.

(Filed 2 February, 1938.)

**1. Taxation § 4—**

What are necessary municipal expenses for which a tax may be levied without a vote is a question for the courts.

**2. Same—**

The courts determine what class of expenses are necessary expenses of a municipality, and the governing body of the municipality determines when such expenses are necessary for that particular locality.

**3. Same—**

Whether a given expense is a necessary expense of a municipality is to be determined by the courts by ascertaining whether the purpose of the expense partakes of a governmental nature or purports to be an exercise by the municipality of a portion of the State's delegated sovereignty.

**4. Same—**

An airport is not a necessary expense of a municipality.

**5. Same—**

A municipality may levy taxes for necessary expenses up to the constitutional limitation without a vote of the people and without legislative authority.

**6. Same: Taxation § 3—**

A municipality may levy taxes for necessary expenses in excess of the constitutional limitation by special legislative authority without a vote of the people. Constitution of North Carolina, Art. V, sec. 6.

**7. Same—**

A municipality may not levy a tax for other than necessary expenses, either within or in excess of the constitutional limitation, without a vote of the people under special legislative authority.

**8. Taxation § 4—**

Since an airport is not a necessary municipal expense, a city may not levy a tax for the purpose of operating, maintaining, and improving a municipal airport without submitting the question to a vote.

**9. Same—Municipality may not levy tax directly or indirectly for purpose of improving municipal airport without a vote.**

Since a municipality may not levy a tax directly for the purpose of operating, maintaining, and improving an airport without a vote of the people, Art. VII, sec. 7, it may not levy a tax for a contingent fund and thereafter in the same year appropriate money from the contingent fund thus created for the purpose of operating, maintaining, and improving the airport, since it may not do indirectly what it is without power to do directly. *Adams v. Durham*, 189 N. C., 232, cited and distinguished.

**10. Municipal Corporations § 43—Municipal Fiscal Control Act prohibits city making appropriation and levying tax for common contingent fund.**

Under provision of the County Fiscal Control Act as applied to cities and towns (secs. 65, 67, 71, of ch. 60, Public Laws of 1931; C. S., 2969 [n]), the governing body of a municipality is required to appropriate and make tax levy for each fund or function separately, and it is without authority to make an appropriation and levy a tax for a common contingent fund, and while it may appropriate an additional five per cent for emergency purposes for each fund for which it has authority to levy a tax, which becomes a part of the fund requirement to be covered by a subse-

quent tax levy, it may not make a transfer from one fund to another except from the general municipal expense fund. Ch. 146, Public Laws of 1927 (C. S., 1334 [53] to [76]).

**11. Same—Municipality may not appropriate money from contingent fund for purpose of operating, maintaining, and improving airport.**

By provision of the County Fiscal Control Act as applied to municipalities, a city may not levy a tax for a contingent fund and thereafter appropriate from the fund so created a sum for the purpose of operating, maintaining, and improving the municipal airport, especially where there is no authority for an "airport fund" in the appropriation resolution.

DEVIN, J., concurring.

BARNHILL, J., concurring.

SCHENCK, J., concurs in the concurring opinion of *Barnhill, J.*

CLARKSON, J., dissenting in part and concurring in part.

APPEAL by defendant from *Warlick, J.,* at November Term, 1937, of MECKLENBURG.

Action for injunction against appropriating funds and levying taxes for operation, maintenance, and improvement of municipal airport without a vote of the majority of the qualified voters.

The plaintiff is a resident and taxpayer of the defendant city of Charlotte, a municipal corporation, of which the codefendants are and constitute the governing body.

By consent of parties, a jury trial being waived, the court below finds pertinent facts substantially as follows: At an election held in the city of Charlotte on 3 November, 1936, the issuance of $50,000 in bonds of said city for the purpose of purchasing a tract of land for a municipal airport, and the levying of a sufficient tax on taxable property therein to pay the principal of and interest on said bonds were approved by a vote of the majority of the qualified voters in said city. Thereafter the governing body of the city purchased approximately 450 acres of land outside of, but near, the limits of the city. The airport constructed thereon with Federal Government funds was completed and turned over to the city about 1 June, 1937, for maintenance and operation.

An airport commission of three was appointed under authority of an act of the General Assembly of 1937, with power to appoint a manager for said airport and to fix his compensation to be paid from the proceeds derived from the operation of the airport, and to establish and collect fees, tolls, and charges from those using said airport and its facilities, and to deposit all proceeds from the said airport from any source in separate account, to be known as the "Airport Fund," of which the treasurer of the city is the treasurer. Disbursements from said fund are authorized to be made on warrant signed by the treasurer, mayor, city manager, and chairman of the airport commission. The airport com-

mission is given authority to employ an assistant manager and such other employees as they may deem necessary for the proper maintenance and operation of the airport.

In the budget for the fiscal year beginning 1 July, 1937, the governing body of and for the city set up and appropriated, and levied taxes to raise, respectively, both (1) the sum of $25.00 to be expended toward the maintenance of the municipal airport, and (2) a sum, the amount of which is not shown in the record on appeal, but in excess of $5,000, and stated by counsel to be $20,000, as a contingent fund.

Thereafter, on 3 November, 1937, the governing body of the city passed an ordinance in which there appears in part the following:

"Whereas, the said commission has been unable to derive sufficient revenue for the operation, maintenance, and upkeep of the said airport in a proper and adequate manner; and whereas, additional hangar facilities are needed at said airport. Now, therefore, be it ordained by the city council in regular session that $5,000 be and the same hereby is appropriated from the contingent fund of the city and transferred to the airport fund to be used in the operating cost, maintenance, and further improvement of the facilities of said airport, said fund to be disbursed in accordance with the provisions of the legislative act authorizing said airport commission, and known as chapter 559 of the Private Laws of 1937."

The court below further finds as a fact: "That the $5,000 referred to in the pleadings transferred from the contingent fund to the airport fund was money derived from taxation and was not an unappropriated surplus fund derived from other sources."

Upon these findings of fact the court below concluded as a matter of law that the city of Charlotte is without authority to appropriate and expend (1) The sum of $25.00 set out in the budget for the purpose of operating and maintaining a municipal airport, and (2) the sum of $5,000 for that purpose under the provisions of an ordinance by the governing body, "without the question being submitted to and approved by a majority of the qualified voters. Art. VII, sec. 7, of the North Carolina Constitution."

Thereupon judgment was entered enjoining and restraining the defendants, and each of them, from expending any sum for the construction, operation, and maintenance of the municipal airport until the question of levying of such taxes has been submitted to and approved by a majority of the qualified voters of said city of Charlotte. The defendant appealed therefrom to the Supreme Court, and assigned error.

*J. L. DeLaney for plaintiff, appellee.*
*Basil M. Boyd for defendants, appellants.*

WINBORNE, J. Two questions arise on this appeal: (1) Are the operation, maintenance, and improvement of a municipally owned airport necessary expenses within the meaning of Art. VII, sec. 7, of the Constitution of North Carolina? (2) Can the governing body of a municipality make an appropriation and levy a tax for a contingent fund, and when the tax money is collected transfer it to, and use it for, a purpose for which such body is without authority to levy a tax?

Both questions are answered in the negative. The action of the city council as the governing body of the city of Charlotte in making the appropriations and tax levies is violative of the provisions of both Art. VII, sec. 7, of the State Constitution and the County Fiscal Control Act applicable to cities and towns.

First: "No county, city, town, or other municipal corporation shall contract any debt, pledge its faith, or loan its credit, nor shall any tax be levied or collected by any officers of the same except for necessary expenses thereof, unless by a vote of the majority of the qualified voters therein." Art. VII, sec. 7, of the Constitution of North Carolina; C. S., 2691.

In the recent case of *Palmer v. Haywood County,* 212 N. C., 284, 193 S. E., 668, it is said: "What are necessary expenses is a question for judicial determination. The judicial decisions in this State uniformly so hold. The courts determine what class of expenditures made or to be made by a municipal corporation come under the definition of 'necessary expense.' The governing authorities of the municipal corporations are vested with the power to determine when they are needed. . . . That is to say, the courts determine whether a given project is a necessary expense of a municipality, but the governing authorities of the municipality determine in their discretion whether such given project is necessary or needed in the designated locality." *Starmount Co. v. Hamilton Lakes,* 205 N. C., 514, 171 S. E., 909; *Black v. Comrs.,* 129 N. C., 121, 39 S. E., 818; *Fawcett v. Mount Airy,* 134 N. C., 125, 45 S. E., 1029; *Storm v. Wrightsville Beach,* 189 N. C., 681, 128 S. E., 17; *Henderson v. Wilmington,* 191 N. C., 269, 132 S. E., 25.

"In defining 'necessary expense' it is said in *Henderson v. Wilmington, supra,* 'We derive practically no aid from the cases decided in other states. . . . we must rely upon our own decisions.' Then, after reviewing numerous cases dealing with the subject of 'necessary expense,' page 278, *Adams, J.,* said: 'The cases declaring certain expenses to be "necessary" refer to some phase of municipal government. This Court, so far as we are advised, has given no decision to the contrary.' Then, on page 279, continues: 'The decisions heretofore rendered by the Court make the test of a "necessary expense" the purpose for which the expense is to be incurred. If the purpose is the maintenance of the public peace

or the administration of justice; if it partakes of a governmental nature or purports to be an exercise by the city of a portion of the State's delegated sovereignty; if, in brief, it involves a necessary governmental expense.' "

When thus tested, an airport is not a necessary governmental expense.

The subject of the authority to levy taxes has been discussed in numerous cases. The law is well settled and may be summed up:

(1) "For necessary expenses. The municipal authorities may levy up to the constitutional limitation without a vote of the people and without legislative permission;

(2) "For necessary expenses, they may exceed the constitutional limitation by special legislative authority without a vote of the people. Constitution, Art. V, sec. 6.

(3) "For other than necessary expenses a tax cannot be levied either within or in excess of the constitutional limitations except by a vote of the people under special legislative authority." *Palmer v. Haywood County, supra; Walker v. Faison,* 202 N. C., 694, 163 S. E., 875; *Glenn v. Comrs.,* 201 N. C., 233, 159 S. E., 439; *Burleson v. Board of Aldermen,* 200 N. C., 30, 156 S. E., 241; *Greene County v. R. R.,* 197 N. C., 419, 149 S. E., 397; *Comrs. v. Assell,* 194 N. C., 412, 140 S. E., 34; *Henderson v. Wilmington, supra; Herring v. Dixon,* 122 N. C., 420, 29 S. E., 368.

Not being a necessary expense, the levy of a tax directly or indirectly to be expended for the purpose of the operation, maintenance and improvement of a municipal airport without a vote of a majority of the qualified voters, is violative of Art. VII, sec. 7, of the Constitution of North Carolina. While the good faith of the governing body of the city of Charlotte is not here impugned, the effect is no different in an indirect appropriation and tax levy than in a direct appropriation and tax levy for an unauthorized purpose. The money collected pursuant to a tax levy for an undesignated purpose under the name of "contingent fund" is, nevertheless, money derived from an *ad valorem* tax. Giving it the name of "contingent fund" does not strip it of its qualities of tax money, nor can it thereby be transformed magically into the character of money "in the treasury" or "money on hand" unappropriated and subject to be used for a purpose for which a direct tax cannot be levied. This patently would authorize to be done indirectly that which the Constitution forbids to be done directly.

It will be noted that the ordinance appropriating the $5,000 in question is not predicated upon any finding or determination of the governing body that it is for a necessary governmental expense. The resolution is based upon the following premises:

3—213

"Whereas, the said commission has been unable to derive sufficient revenue from the operation, maintenance, and upkeep of the said airport in a proper and adequate manner; and

"*Whereas, additional hangar facilities are needed at said airport.*"

The case of *Adams v. Durham,* 189 N. C., 232, 126 S. E., 611, is distinguishable from the instant case. There the city had on hand a fund derived from the sale of a municipal building, and no question of taxation or credit was involved. It is there specifically pointed out that "in no event shall further liability be imposed on the city" in the construction of the new building. Here, we are dealing with a question of taxation and the use of a contingent fund derived from a tax levy. The Constitution is not to be circumvented by the simple device of raising a contingent fund by taxation and then using it in the promotion of objects for which a direct tax could not be levied.

Second: The County Fiscal Control Act (chapter 146, Public Laws 1927; C. S., 1334 [53], 1334 [76]), which provides the machinery, charts the course, and prescribes the limitations for the administration of the fiscal affairs of counties, including the budgeting for appropriations and levying of taxes to cover same, is made applicable to cities and towns by sections 65 and 67 to 71 of chapter 60 of the Public Laws of 1931.

Sec. 65 thereof, C. S., 2969 (n), reads: "All cities and towns shall be subject to and be governed by all of the provisions of the County Fiscal Control Act and acts amendatory thereof and supplemental thereto, including acts ratified at the present session of the General Assembly, except as herein otherwise provided or except as the context shows that it is not intended that such acts should be applicable to cities and towns."

Section 74 reads: "The provisions of this act shall apply to all counties, cities, and towns in this State, regardless of any provision to the contrary in any special or local act heretofore enacted."

The record fails to disclose any allegation, admission, or finding of fact that the city of Charlotte comes, or is operating within the provisions of the exceptions of the said section 65.

In section 68 there are defined the funds required for cities and towns for each of the functions of municipal government. It is there prescribed, when read in connection with the County Fiscal Control Act, that each fund for each function shall be stated separately in preparing the budget estimate for appropriation, and shall be so set up in the appropriation resolution and tax levy.

Analyzing pertinent sections of County Fiscal Control Act, as applied to cities and towns, we find that: (1) The municipal accountant shall prepare and submit to the governing body not later than the first Monday in July a "budget estimate" of: (a) The amounts necessary to be

appropriated for the next ensuing fiscal year for the different objects of the municipality, listing each object of disbursement under the appropriate class of function as defined in section 68 of chapter 60, Laws of 1931, "which estimate shall include the amount of any deficit in any fund, and *may include an emergency estimate for each fund not greater than FIVE per cent in excess of other estimates for such fund"*; (b) an itemized estimate of the revenue to be available during the ensuing fiscal year, separating revenue from taxation from revenue from other sources, classifying the same under proper funds as defined in said section 68 of chapter 60, Public Laws 1931; and (c) an estimate of the amount of unencumbered and surplus revenues of the current fiscal year in each fund.   C. S., 1334 (57); C. S., 2969 (o); C. S., 2969 (p).

(3) Then the governing body, not later than the fourth Monday in July, shall adopt and record on its minutes an appropriate resolution, which shall make appropriation for the several purposes of the municipality, upon the basis of the estimates and statements submitted by the municipal accountant such sums as the governing body may deem sufficient and proper, whether greater or less than the recommendation of the budget estimates; "Provided, however, that '(d) no appropriation shall be made in excess of the amount which may be raised under any constitutional or statutory limits of taxation.' "   C. S., 1334 (59)/. This resolution becomes the chart for the municipal accountant and municipal treasurer in disbursing the city funds.   C. S., 1334 (60).

(4) Before any levy of taxes is made the municipal accountant shall submit to the governing body a supplemental budget showing: "(a) The amount of any increase or decrease in each item of (1) deficits and (2) unencumbered balances and (3) surplus revenues as reported by him in the budget estimate, and (b) the amount of miscellaneous revenues collected in the preceding year from sources other than taxation, this amount to be separately classified as to funds and functions, and (c) an estimate of the amount of taxes for the current fiscal year which will not be collected in the same year. Upon the submission of the figures showing increase or decrease in deficits, the appropriation resolution shall be deemed automatically amended by adding such increase to or subtracting such decrease from the amount appropriated for the fund or function to which such deficit pertains.   . . ."

(5) Thereafter, and not later than Wednesday after the third Monday in August, the governing body, by resolution to be recorded in its minutes, shall levy upon all the taxable property of the city such rate of tax as may be necessary to produce: "(a) The sum appropriated and (b) the amount of the supplemental budget estimate of taxes which will not be collected in the current fiscal year, after taking into consideration the figures contained in the budget estimates and supplemental

budget showing surplus revenues and unencumbered balances carried over from the preceding fiscal year and the estimated miscellaneous revenues from other sources than taxation." C. S., 1334 (63).

(6) No appropriation made by the appropriation resolution, except an appropriation for general municipal expenses, shall be transferred from one fund to another fund, and no appropriation for general municipal expenses shall be transferred to any fund of any subdivision of the municipality, or *vice versa*. C. S., 1334 (64).

(7) Then follows provisions prescribing restrictions and limitations for contracting with reference to and disbursing the funds—with penalties for violations of the act. C. S., 1334 (65) to 1334 (72), under the County Fiscal Control Act as applied to cities and towns.

Thus, it is seen that the governing body of the city of Charlotte is required to appropriate and make tax levy for each fund or function separately. It is without authority to make an appropriation and levy a tax for a common contingent fund. For emergency purposes as to each fund for which it has the authority to levy a tax, it may appropriate an additional five per cent of the fund requirement which becomes a part of that fund requirement to be covered by subsequent tax levy. Only from the general municipal expense fund may transfer be made to any other fund—and there is no authority for an "airport fund" in the appropriation resolution.

It is worthy in passing to pause and appraise that part of the preamble to the ordinance transferring the $5,000 fund which reads: "Whereas, additional hangar facilities are needed at said airport," followed by the appropriation "to be used in further improvement of the facilities of said airport." "Hangar," in connection with an airport, is defined to be "a shed for housing aeroplanes." "Facility" is "that which facilitates any action; aid;" used in plural as "facilities for trade, study, travel, etc." "Improvement" is "a valuable addition or betterment, as a building, clearing, drain, fence, etc., on land."

If the approval by the qualified voters of the purchase of an airport site be implied authority to the governing body of the city to spend tax money to build hangars, why not for concrete runways and other additions and improvements without limit, without further approval of such voters?

The judgment of the court below is
Affirmed.

DEVIN, J., concurring: I concur in the result reached in the well considered opinion delivered by *Winborne, J.*, for the majority of the Court.

I do not understand that on this record the decision goes to the extent of holding that the city is without power, by appropriate resolution, to

provide for the expenditure of money in its treasury applicable to general municipal expenses when this is done for the purpose of protecting and making essential repairs to property owned by the city and used for a public purpose.

The County Fiscal Control Act is by later statute made applicable to cities and towns, except where the context shows that it was not so intended. The act contains this provision: "No appropriation made by the appropriation resolution, except an appropriation for general county expenses, shall be transferred from one fund to another, and no appropriation for general county expenses shall be transferred to any fund of any subdivision, or *vice versa*. C. S., 1334 (64). The last clause obviously is inapplicable to cities and towns.

Thus it appears that the transfer by the city of funds appropriated for general municipal expenses to another fund for an authorized municipal purpose, such as the necessary maintenance and repairs to city property, would not seem to be prohibited by the Municipal Fiscal Control Act. Otherwise, the city might be seriously hampered in the performance of its corporate functions, in case of a sudden casualty or emergency, or be caused to incur substantial liability.

This would not involve a violation of Art. VII, sec. 7, of the State Constitution.

Nor is there anything in the holding in *Adams v. Durham,* 189 N. C., 232, 126 S. E., 611, as interpreted by later decisions, that would invalidate an appropriation from funds already in the treasury for this essential purpose. In *Holmes v. Fayetteville,* 197 N. C., 740, 150 S. E., 624, upholding the right of the city "to use only such available funds as it has" for the purpose of extending its electric light facilities beyond the city limits, it was said (*Adams, J.,* speaking for the Court): "This course was pursued in the erection of a building in the city of Durham and was approved by this Court, but the auditorium was in the city and was intended for a public purpose. *Adams v. Durham,* 189 N. C., 232."

In *Nash v. Monroe,* 198 N. C., 306, 151 S. E., 634, it was said (*Brogden, J.,* speaking for the Court): "Undoubtedly, if the city of Monroe had the money in its treasury, it could purchase equipment for its hospital. *Adams v. Durham,* 189 N. C., 232." It was there held that a municipal hospital is not a necessary governmental expense.

In *Mewborn v. Kinston,* 199 N. C., 72, 154 S. E., 76, we find this language: "The right of the city to use funds on hand for a public purpose is fully sustained by the decisions of this Court. *Adams v. Durham,* 189 N. C., 232."

In *Burleson v. Board of Aldermen,* 200 N. C., 30, 156 S. E., 241, where the application of funds of a town for the maintenance of a hospital, a public purpose but not a necessary expense, was consid-

ered, *Connor, J.*, speaking for the Court, uses this language: "Under the authority of *Adams v. Durham,* 189 N. C., 232, it may apply for that purpose funds already on hand in the treasury of the city or town."

In *Goswick v. Durham,* 211 N. C., 687, it was said: "The acquisition of the land (for public purpose) from surplus funds was not beyond the power of the city, and it in no way offended the provisions of Art. VII, sec. 7, of the Constitution," citing *Adams v. Durham, supra,* and *Nash v. Monroe, supra.*

I concur in the view that the maintenance of an airport may not now be classed as a necessary municipal expense, and that, upon the facts presented by the record in this case and under the resolution of the city, the appropriation of $5,000 from the contingent fund of the city to the airport fund for additional hangar facilities cannot be upheld. To do so would be to open the door to appropriations for new and additional construction, and would permit expenditures which would necessarily require the levy of taxes indirectly in violation of Art. VII, sec. 7, of the Constitution.

The inclusion in the budget of a sum to be raised by the levy of taxes for the maintenance of the municipal airport was properly enjoined as in conflict with the prohibition contained in the above quoted section of the State Constitution.

BARNHILL, J., concurring: The resolution adopted by the city council of the city of Charlotte, transferring $5,000 from the contingency fund to the maintenance fund for the municipal airport, contemplates that this fund shall be used for the enlargement and improvement, as well as for the maintenance, of the airport. The operation of an airport is not a necessary expense of a municipality any more so than would be the operation of a railway terminal or a railway or bus line depot. Consequently, the city council is without authority to make the proposed expenditure for the purposes contemplated by the resolution. The inclusion of $25.00 in the budget for the operation and maintenance of the airport was likewise without authority in law. A municipality is not authorized to operate, as a necessary expense of the municipality, airports, railway terminals, railroad or bus line depots, or similar undertakings. It follows that the city council was without authority to levy a tax without a vote of the people to operate the airport.

I am of the opinion, however, that the city council has the authority to use tax money to keep the airport property in a reasonably safe condition. In so far as the majority opinion intimates, if it does so intimate, that the city council is without this authority, I disagree.

The city acquired the airport property under mandate of the people as expressed in an election. When the city acquired the property it did

SING *v.* CHARLOTTE.

so in its proprietary capacity. *Non constat,* the city having acquired the property, it immediately became the duty of the city council to maintain the same in a reasonably safe condition, not only for the purpose of preserving the property of the city, but likewise for the purpose of protecting the city against contingent liability for injury sustained by persons legally using the property. This property should be maintained by the city council as all other property owned by the city, and the cost of its maintenance constitutes a necessary expense. The money needed therefor should come from the same fund as does the money which is used to maintain the other property owned by the city, or from the general expense fund.

SCHENCK, J., concurs in this concurring opinion.

CLARKSON, J., dissenting in part and concurring in part: In one aspect I cannot agree with the main opinion:

(1) I think the levy of $25.00 included in the budget for the fiscal year ending 30 June, 1938, for the Charlotte "airport" was a necessary expense and it was not such an expense that should be submitted to a vote of the people, under Const. of N. C., Art. VII, sec. 7.

(2) I think the governing body of the city of Charlotte has a right to pass an ordinance transferring $5,000, on hand unappropriated and collected as a "contingent fund," for the "airport." In the concurring opinion of *Devin, J.,* is the following: "I do not understand that on this record the decision goes to the extent of holding that the city is without power, by appropriate resolution, to provide for the expenditure of money in its treasury applicable to general municipal expenses when this is done for the purpose of protecting and making essential repairs to property owned by the city and used for a public purpose." If this is the correct interpretation, on this aspect I concur.

The judgment of the court below is as follows: "This cause coming on to be heard before the undersigned judge at the November, 1937, Term of the Superior Court, and a stipulation having been entered into waiving a jury trial and agreeing that the court finds the facts in said cause, and the court having found the following facts: '(1) That the plaintiff is a citizen, resident, and property owner and taxpayer of the city of Charlotte, North Carolina. (2) That the defendants constitute the governing body of the city of Charlotte, a municipal corporation. (3) That the city of Charlotte is a city of substantial and fastly expanding government, with a population of approximately 95,000, and total taxable values of approximately $110,000,000, and is strategically located for further immediate growth and development, and has been recognized by the Federal Government as a strategic airport center between New

York and Miami, Florida, being three and three-fourths hours from New York and six and one-half hours from Miami by way of airline. (4) That in the budget for the fiscal year beginning 1 July, 1937, and ending 30 June, 1938, which budget was duly adopted by the governing authorities of the city of Charlotte, as by law provided, an appropriation of $25.00 was made to be expended towards the maintenance, operation, and upkeep of the said airport. That the $5,000 referred to in the pleadings transferred from the contingent fund to the airport fund was money derived from taxation and was not an unappropriated surplus fund derived from other sources. (5) That on 3 November, 1936, the voters of the city of Charlotte voted upon and approved an ordinance authorizing the issuing of bonds by the city of Charlotte in the sum of $50,000 for the purpose of purchasing a tract of land for a municipal airport, which ordinance further provided that a tax sufficient to pay the principal and interest on the said bonds should be annually levied on all taxable property in the city of Charlotte; that of the entire voting population of approximately ............ thousand qualified voters, only 119 votes were cast against said bonds. (6) That pursuant to the approval of said bonds by the voters of the city, the governing body of said city issued said bonds and purchased with the proceeds thereof approximately 450 acres of land outside the limits of, but near the city of Charlotte. (7) That thereafter the Federal Government spent approximately $325,-000 for leveling and grading the said land, building three runways, and equipping said field with an office or administration building, one hangar, and a field lighting system, completing the same about 1 June, 1937, and turned the same over to the city of Charlotte for maintenance and operation. (8) That the Highway Commission of the State of North Carolina constructed a highway approximately ............ miles long from State Highway .......... to said airfield, and built a concrete bridge over the main line of the Southern Railway over which said highway crossed, all for the total cost of approximately $35,000. (9) That pursuant to the authorities vested in the said city of Charlotte by the 1937 session of the North Carolina General Assembly, the governing body of the said city of Charlotte appointed an "airport commission," composed of three citizens who serve without pay, to operate said airport for the city, in which said legislative act the treasurer of the city of Charlotte is designated as treasurer of the airport funds, and all moneys collected from the operation of said airport are disbursed by said treasurer upon warrants signed by him, the mayor of the city of Charlotte, the city manager of the city of Charlotte, and the chairman of said airport commission, and that said airport commission is authorized to employ a manager, assistant manager, and such other employees as they deem necessary for the proper maintenance and operation of said airport.

(10) Since its appointment in July, 1937, the said airport commission has been operating said airport in this manner for the benefit of the city of Charlotte, in which said city the title to the property and improvements thereon is vested. (11) That the present and prospective income from the operation of said airport is grossly inadequate to meet the cost of operating and properly maintaining said airport, and that the only funds available for the operation and maintenance of said airport are such funds as the commission is able to derive from its operation, which funds are not sufficient to employ the necessary personnel for the proper operation of said airport, to say nothing of its maintenance and upkeep. (12) That the Department of Air Commerce of the Federal Government in conjunction with the United States Post Office Department has designated the said airport as an air mail distributing center, and the Eastern Air Lines, Inc., are now operating six planes daily through said airport, giving air mail, passenger and express service; that in order to keep this service in North Carolina and the city of Charlotte, it is necessary, under the requirements of the Federal Government, to keep the said airport and its facilities up to a certain standard of equipment and condition at all times, which requirements necessitate the expenditure of more money than is derived from the operation of said airport. (13) That unless the said city of Charlotte is permitted to expend the sums appropriated for the maintenance, operation, and upkeep of said airport, it will result in great damage and depreciation, while, on the other hand, such sums so spent will result in saving and economy to the taxpayers of the city of Charlotte; that unless the said city is permitted to spend said sums thus appropriated, it will be unable to maintain said airport to the standard of conditions prescribed by the Federal Government for the air mail center and said service will be withdrawn, thus resulting in loss of revenue and other attending losses.' Upon the above findings of fact, the court is of the opinion that the city of Charlotte is without authority to appropriate and expend the sum of $25.00 set out in the budget for the purpose of operating and maintaining the municipal airport, and is also without authority to appropriate and expend the sum of $5,000 for that purpose under the provisions of an ordinance passed by the council of the city of Charlotte, a copy of which ordinance being attached to the complaint, marked 'Exhibit A,' without the question being submitted to and approved by a vote of a majority of the qualified voters as provided in Article VII, section 7, of the Constitution of North Carolina: It is therefore ordered, adjudged, and decreed that the defendants, and each of them, be enjoined and restrained from expending any sum for the construction, operation, and maintenance of a municipal airport until and when the question of levying such tax has been submitted to and

approved by a majority of the qualified voters of the city of Charlotte. This 8 November, 1937. Wilson Warlick, Judge presiding."

It is to be noted that (1) "the appropriation of $25.00 was made to be expended towards the maintenance, operation, and upkeep of the said airport," and that (2) "the $5,000 . . . transferred from the contingent fund to the airport fund was money derived from taxation and was not an unappropriated surplus fund derived from other sources." It is apparent that the revenues from the airport are insufficient to maintain it in such a way that it would retain its status as an airmail distributing center and a regular passenger and express depot. Unless its revenues are supplemented by tax funds, the large investment of the city will rapidly depreciate, its usefulness will be increasingly lessened until it is ultimately destroyed, and that which was rightly conceived as a far-sighted, advantageous, and progressive enterprise will die for want of sufficient public support during the early years of the project.

The citizens of Charlotte voted a $50,000 bond issue to construct this municipal airport. Only 119 votes were cast against the bond issue. The Federal Government spent $325,000, and the State Highway and Public Works Commission another $35,000, to complete this airport. When the citizens of Charlotte voted the bonds, when the Federal Government made the grant, and when the State project was approved, it was generally and necessarily assumed by the citizens and the Federal, State, and local officials alike that the maintenance of the airport would be upon the municipality, certainly until the project should become self-supporting. It is significant that the judgment states that upon the completion of the airport by the Federal Government about 1 June, 1937, it was "turned . . . over to the city of Charlotte for maintenance and operation." When the citizens of Charlotte voted upon the establishment of a municipal airport, the very nature of the proposition submitted involved two elements: (1) The initial outlay of $50,000 by the city, and (2) the assumption of the general support and maintenance of the airport until such time as the airport should become self-supporting. The movement to establish the airport was initiated by the city and for the city. No other agency assumed the support of the airport. The citizens of Charlotte, by their vote, approved the airport and assumed its maintenance. By the mandate of the people, the city of Charlotte has the implied obligation to maintain this airport and to make expenditures essential to its general maintenance.

The essence of Art. VII, sec. 7, of the Constitution is the provision that no "tax be levied . . . except for necessary expenses, . . . unless by a vote of the majority of the qualified voters therein." Only under two conditions may taxes be levied by a municipal corporation: (1) For necessary expenses of government, or (2) where voted by the

people. *Glenn v. Commissioners of Durham,* 201 N. C., 233. It might well be argued that a municipal airport is essential to and a necessary expense of a city of the size and importance of Charlotte. As was said in *Storm v. Wrightsville Beach,* 189 N. C., 679 (681), "The question, what is a necessary expense, which is a judicial one for the courts to determine, is one that cannot be defined generally so as to fit all cases which may arise in the future. As we progress, we look for better moral and material conditions and the governmental machinery to provide them. 'Better access to the good things of life for all people,' safety, health, comfort, convenience in the given locality. . . . The term in the Constitution 'necessary expenses' is not confined to expenses incurred for purposes absolutely necessary to the very life and existence of a municipality, but it has a more comprehensive meaning. It has been held in this jurisdiction that streets, waterworks, sewerage, electric lights, fire department and system, municipal building, market house, jail or guard house, are necessary expenses."

In *Goswick v. Durham,* 211 N. C., at pp. 689-690, *Justice Devin* wrote, "While there is no contention that the construction, equipment, and maintenance of an airport and landing field is a necessary municipal expense within the meaning of Article VII, section 7, of the Constitution (*Henderson v. Wilmington,* 191 N. C., 269), yet it may not be improper to say that man's constantly advancing progress in the conquest of the air as a medium for the transportation of commerce and for public and private use indicates the practical advantage and possible future necessity of adequate landing facilities for the use of the 'argosies of magic sails . . . dropping down with costly bales' to the same extent that paved streets and roads are now regarded for the purposes of communication and transportation on land. *Hargrave v. Comrs.,* 168 N. C., 626; *Dysart v. City of St. Louis,* 321 Mo., 514. As was said by *Brogden, J.,* speaking for the Court in *Walker v. Faison,* 202 N. C., 694: "The law is an expanding science, designed to march with the advancing battalions of life and progress and to safeguard and interpret the changing needs of a commonwealth or community."

In *Starmount Co. v. Hamilton Lakes,* 205 N. C., at p. 520, *Justice Brogden* quoted the general rule: "The courts determine what class of expenditures made or to be made by a municipal corporation come under the definition of 'necessary expense.'" Then he added, "That is to say, the courts determine whether a given project is a necessary expense of a municipality." By judicial approval of particular expenditures, the list of "necessary expenses" is constantly growing as befits the law of a progressive commonwealth. Until a particular type of expenditure is brought within the magic circle of "necessary expenses," such expenditures cannot be made by a municipality without a vote of the citizens.

Even though the particular type of expenditure has been approved by the court in one case, such as expenditure for a different municipality under different conditions still remains a question for the court. In *Storm v. Wrightsville Beach, supra,* it was declared that incinerators for the destruction of garbage, and jetties to protect the town from the ocean, are "necessary expenses." Yet, it is quite obvious that an expensive incinerator would not be a "necessary expense" for a small, rural village, nor would jetties against the ocean be a "necessary expense" for any inland or mountain town. An expense may be a "necessary expense" for one municipality, but not a "necessary expense" for another municipality. As stated in the majority opinion, "the courts determine whether a *given project* is a necessary expense of a municipality." This power of the Court to examine the necessity for a particular expenditure is not eliminated by the mere fact that an expenditure for a similar purpose, an expenditure within the same general class, has been previously approved for another municipality under quite different circumstances. The test for a "necessary expense" suggested by the majority— whether the purpose "partakes of a governmental nature or purports to be an exercise by the city of a portion of the State's delegated sovereignty"—is scarcely a precise one. What is, or is not, "of a governmental nature" remains a matter of judicial determination; the limitations of the phrase "of a governmental nature" are even more vague than those of the words "necessary expenses." Bearing in mind that an expenditure for a particular purpose in one community does not set a binding precedent with respect to a similar expenditure in some other community, I think that the overwhelming logic of the instant case compels the recognition that a municipal airport at Charlotte, under the conditions set out in the judgment, is a "necessary expense." Treating the maintenance of the airport as a "necessary expense," it follows that the governing body of the city could levy taxes for this purpose. *Tucker v. Raleigh,* 75 N. C., 267; *Jones v. New Bern,* 152 N. C., 64.

The citizens of Charlotte approved the bond issue for the purpose of building the airport—I think that the "vote of the majority of the qualified voters" thereby complied with the requirement of Art. VII, sec. 7, of the Constitution. When the citizenship of a community expressly approves the establishment of a public project at public expense, there is necessarily the approval by the citizens of the continued operation of that project. It is inconceivable that the citizens would approve the establishment of a project which they did not wish operated thereafter. If this were not true, the entire expenditure assumed by the citizens would be wasted. In my opinion, when the citizens of Charlotte voted to establish an airport at municipal expense, their vote became a

mandate to the governing body to continue to maintain and to operate the airport at municipal expense.

Under this latter view it becomes pertinent to examine to what extent this mandate was applicable. Certainly it extended to include the usual and ordinary maintenance, repair, and current operating expenses. If this mandate extended at all to the "maintenance" of the airport (and that it did seems abundantly demonstrated), it extended, as a minimum, to the ordinary, commonplace, and routine operation and maintenance expenditures. It seems to me that this mandate might also be extended to include expenditures for capital outlay items, such as additional hangars, under the theory that the vote of the people gave to the governing body of the city authority to expand, as well as maintain, the airport in keeping with the rapidly changing needs of a beginning enterprise.

The reasoning of *Justice H. G. Connor,* in *Brockenbrough v. Comrs.,* 134 N. C., 1, is applicable here; there, at p. 16, he wrote: "The people of Charlotte have by their votes declared that a system of waterworks is essential to their corporate welfare and safety. They have empowered their municipal servants and agents to expend a large sum for securing such a system. It is not clear that this involves the duty of protecting this property and making it efficient for the very important, may we not say necessary, purpose for which it was acquired? If so, the power to contract such obligations as are necessary to discharge the duty must be found. 'Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, and designated as a chart upon which every man, learned or unlearned, may be able to trace the leading principle of government.' Cooley, Constitutional Limitations, 59."

Whether the judgment of the citizens of Charlotte in establishing this airport was sound is not before this Court. The citizens have made the investment and now ask this Court the privilege of protecting it without the additional expense of a special election each year to approve the allotment of funds for an enterprise which has the almost unanimous approval of the entire taxpaying citizenship. Art. VII, sec. 7, was intended to protect the people in their rights, not to prevent them from exercising their rights after they had given their solemn judgment by ballot. When the people have spoken, the courts should be slow to thwart the popular will. The abiding and protective spirit which broods over the entire Constitution is that the will of the people, as far as it may be or has been determined, shall prevail; that which tends to defeat the expressed wishes of the sovereign citizenship is inimical to this spirit of the Constitution.

This view of the law of this case has received legislative sanction in the following clear and unequivocal terms: "The *governing body* or

bodies *of a city,* town, and/or county which has or have established an airport or landing field, and acquired, leased, or set apart real property for such purpose, *may* construct, *improve,* equip, *maintain and operate* the same. The *expense of such* construction, *improvement, maintenance and operation shall be a city, town, and/or county charge as the case may be. . . ."* (Italics mine.) Public Laws 1929, ch. 87, sec. 7 (Michie's N. C. Code, 1935, sec. 191g). *"The governing body* or bodies *of a city,* town, and/or county to which this act is applicable (Public Laws 1929, ch. 87, sec. 2, made the act applicable to "any city or town in the State"), having power to appropriate, individually or jointly, money therein, are *hereby authorized to annually appropriate and caused to be raised by taxation in such city, . . . a sum sufficient to carry out the provisions of this act. . . ."* (Italics mine.) Public Laws 1929, ch. 87, sec. 8. (Michie's N. C. Code, 1935, sec. 191h.)

Under a liberal application of the view that the approval of the people carried a mandate to the governing body to maintain and improve the airport, both the $25.00 appropriation and the $5,000 appropriation would be fully approved, even to the extent of use of the funds for the building of an additional hangar. Even under a restricted interpretation of this mandate, the $25,000 appropriation would be valid; and the $5,000 appropriation, if limited strictly to the purpose of current maintenance and general operating expenses (a limitation which is not required by the general statute), would likewise be valid. Further, under the theory that a municipal airport for Charlotte, under present conditions, is a "necessary expense," both the $25.00 and the $5,000 appropriations for the airport would be valid. I think the facts in the present case similar to those in the case of *Adams v. Durham,* 189 N. C., 232.

In *Nash v. Monroe,* 198 N. C., 306 (307), it is said: "Undoubtedly, if the city of Monroe has the money in its treasury, it could purchase equipment for its hospital. *Adams v. Durham, supra; Henderson v. Wilmington, supra."*

Streets and highways are "necessary expenses," under Art. VII, sec. 7, of our Constitution. Airports, to facilitate the landing, flight, and accommodation of aeroplanes, traveling over air routes and carrying passengers, freight, mail, and the varied commerce of the air, may, in the widening realm of human progress, be a necessary expense in certain localities, as the present. The expenditure of money by the city of Charlotte, a city of its size, for the maintenance of a municipal airport, is, I think, a necessary expense within the meaning of Art. VII, sec. 7, of the Constitution.

Hence, it follows that the inclusion in the budget for the fiscal year ending 20 June, 1938, of the sum of $25.00 to be expended for this purpose and for which taxes are to be levied and collected, without a vote

of the people, comes within the provisions of the Constitution. The main opinion in the holding declares void the act of the General Assembly above set forth; which says: "The expenses of such construction, improvement, maintenance, and operation *shall be* a city, town, or county charge as the case may be."

In my opinion, the use of this fund, $5,000, on hand, unappropriated, for the current maintenance and operation of the airport is permissible.